USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/16/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
GERALDO GARCIA-LEONARDO,                                     :        10 Civ. 6653 (JSR) (DF)
                                                            :        03 Cr. 134 (JSR)
                                    Petitioner,              :
                                                            :        **REPORT AND**
            -against-                                        :        **RECOMMENDATION**
                                                            :
UNITED STATES OF AMERICA,                                    :
                                                            :
                                    Respondent.              :
------------------------------------------------------------X

**TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:**

In this habeas proceeding, commenced in 2010, *pro se* petitioner Geraldo Garcia-Leonardo ("Petitioner") moves under 28 U.S.C. § 2255 to vacate, set aside, or modify the sentence imposed upon him by this Court, in the criminal case bearing Docket No. 03 Cr. 134 (JSR). (*See* Dkt. 1, in 10 Civ. 6653.) Upon pleading guilty in that case to engaging in a heroin and cocaine distribution conspiracy, in violation of 21 U.S.C. § 846, Petitioner was sentenced to 240 months of imprisonment and five years of supervised release, and was ordered to pay a mandatory special assessment. He is currently incarcerated at the Rivers Correctional Institution, in Winton, North Carolina. Respondent the United States of America (the "Government") opposes Petitioner's motion.

For the reasons set forth below, I recommend that Petitioner's Section 2255 motion be denied, in its entirety, for lack of merit.

**BACKGROUND**

**A.      The Indictment**

Petitioner and 12 co-defendants were indicted on February 13, 2003, and charged, in Count One of the Indictment, with participating, from approximately July 2002 to January 2003,

in a conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and one kilogram or more of heroin, in violation of 21 U.S.C. § 846.[1]   (*See* Indictment No. S2:03 Cr. 134.)  The Government contended that Petitioner acted as a "manager" in the drug operation, employing one of his alleged co-conspirators, Edwin Sanchez ("Sanchez") as his driver, and directing the activities of Sanchez and others, in furtherance of the conspiracy.[2]

### B.     The Government's *Pimentel* Letter and Petitioner's Guilty Plea

By letter dated October 17, 2005, prior to an anticipated guilty plea by Petitioner and pursuant to the suggestion of the Second Circuit in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), the Government informed Petitioner of its position, at that time, regarding the application of the Sentencing Guidelines to Petitioner's case.  (*See* Supplemental Appendix submitted by the Government on appeal ("Supp. App'x"), at SA-1 (*Pimentel* Letter).)  In its letter, the Government stated its view that, based on the quantities of drugs involved in the crime, Petitioner's base offense level was 36; that a three-level increase was warranted, pursuant to U.S.S.G. § 3B1.1(b), because Petitioner was a "manager or supervisor of a criminal activity that involved five of more participants (and was otherwise extensive)";[3] and that a three-level

---

[1] The Indictment also contained a second Count, which was asserted against two of Petitioner's co-defendants, and is not relevant here.

[2] *See* Brief for the United States of America, Appellee, Docket No. 07-3779-cr(L), dated July 18, 2008, at 3.

[3] Section 3B1.1(b) of the Sentencing Guidelines provides that a defendant's offense level may be increased by three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  "A defendant acts as a 'manager or supervisor' of a criminal enterprise involving at least five participants if he 'exercises some degree of control over others involved in the commission of the offense, or plays a significant role in the decision to recruit or to supervise lower-level participants."  *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995) (internal quotation marks and citations omitted).

decrease would also be warranted, if Petitioner were to plead guilty and to commit no acts, prior to sentencing, that would be inconsistent with his acceptance of responsibility for the offense. (*Id.*, at 2.)  Thus, assuming Petitioner's acceptance of responsibility, the Government took the position that his applicable Guidelines offense level was 36.  (*Id.*)  With its understanding that Petitioner's Criminal History Category was I, the Government then concluded that the Sentencing Guidelines yielded a sentencing range of 188-235 months' imprisonment, with a statutory minimum term of imprisonment of 120 months, under 21 U.S.C. § 841(b)(1)(A).

### C.   <u>Plea Proceedings</u>

On October 18, 2005, Petitioner pleaded guilty to Count One of the Indictment, before then-Chief Judge Michael B. Mukasey, of this Court.  (*See* Supp. App'x, at SA-4 to SA-22 ("Plea Tr.").)  During the plea proceedings, Petitioner was represented by appointed counsel, Patrick James Joyce, Esq. ("Joyce") (*see id.*, at SA-4; *see also* Dkt. 128, in 03 Cr. 134), and the Government was represented by Assistant United States Attorney Eric Snyder (*see* Plea Tr., at SA-4).  At the outset of the plea allocution, the Court placed Petitioner under oath and cautioned him that his answers to the Court's questions would be subject to the penalties of perjury or of making a false statement, if Petitioner did not answer truthfully.  (*Id.*, at SA-6.)  The Court then determined, based on Petitioner's responses, that Petitioner was competent to enter a plea (*id.*, at SA-8[4]), advised Petitioner of the substance of the charge against him (*id.*, at SA-11 to SA-12),

---

[4] At one point in the allocution, the Court seemingly asked the Government and defense counsel if either had any doubt that Petitioner was competent to enter a plea, but the plea transcript reflects an apparent typographical error, in that it reads "Mr. Snyder, Mr. Joyce, does either of you have any doubt that Mr. Garcia is *question* to enter a plea?"  (Plea Tr., at SA-8 (emphasis added).)  Petitioner quotes from this portion of the transcripts in his motion papers (*see* The Petitioner Garcia-Leonardo Reply to the Government's Response in Opposition of His 28 U.S.C. § 2255 Claims, undated, but received by the Court on July 20, 2011 ("Pet. Reply") (Dkt. 196 in 03 Cr. 134), at 3, 5), although it is unclear how he believes it would aid his position.

3

and confirmed that he understood the constitutional rights that he would be giving up by

foregoing trial, including the right to a trial by jury (*see id.*, at SA-8 to SA-10).  After asking a

series of questions relating to Petitioner's relinquishment of his rights, the Court summarized:

> THE COURT:   If you plead guilty and if I accept your plea, then
> you will give up your right to a trial and the other
> rights I've just mentioned other than a right to a
> lawyer which you have at all times, regardless of
> your plea, but there will be no trial and I will enter a
> judgment of guilty and sentence you on the basis of
> your plea after I consider the presentence report and
> whatever information I get from the government
> and from your lawyer.
>
> Do you understand that?
>
> THE DEFENDANT:  Yes, sir.

(*Id.*, at SA-10.)

The Court went on to explain to Petitioner the minimum and maximum sentences he

could face, confirming that he understood this:

> THE COURT:   The maximum possible penalty that I can impose –
> that is, the most that I can sentence you to – is life
> imprisonment, a fine of $4 million, 400 dollar
> special assessment or special fine, and up to a
> lifetime term of supervised release if the jail
> sentence is less than life.
>
> Do you understand that?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:   The least that I can sentence you to is ten years'
> imprisonment and five years of supervised release,
> plus a 100 dollar special assessment or special fine.
> That's the least.
>
> Do you understand that?
>
> THE DEFENDANT:  Yes, sir.

4

(*Id.*, at SA-12 to SA-13; *see also id.*, at SA-13 to SA-14 (reiterating statutory minimum sentence, after explaining Court's ultimate obligation "to impose a reasonable sentence in light of all the appropriate considerations, including the sentencing guidelines").)

The Court further elicited from Petitioner that his plea was voluntary (*see id.*, at SA-14), that he had no plea agreement with the Government (*id.*), and that no promises had been made to him regarding the sentence he would receive (*id.*; *see also id.*, at SA-17). As to these points, the Court allocuted Petitioner as follows:

> THE COURT: Has anyone threatened you or anyone else or forced you in any way to plead guilty?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Is there any plea agreement in this case that you're aware of?
>
> THE DEFENDANT: A what?
>
> THE COURT: Is there any agreement between you and the government relating to this plea?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Has anyone at all made any kind of promise or inducement to you in order to get you to plead guilty?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: In particular, has anyone made any promise to you as to what your sentence will be in this case?
>
> THE DEFENDANT: No, sir.

(*Id.*, at SA-14.)

As the Government had provided Petitioner with a *Pimentel* letter, the Court also

explained to Petitioner the content and purpose of that letter, as follows:

> THE COURT:  Now, the government has sent your lawyer what's
> called a Pimentel letter, which simply states what
> the government's expectation is currently about
> what the correct guideline range is, is that right?

> THE DEFENDANT:  Yes.

> THE COURT:  And the government has stated that it's their
> expectation that the correct range is 188 to 235
> months.  That's what was in the letter, correct.

> MR. JOYCE:  May I have a conversation with my client through
> the interpreter?

> THE COURT:  Yes.

> MR. JOYCE:  Your Honor, I've had an opportunity to speak with
> Mr. Garcia.  I will state for the record that on
> Thursday, I was in the government's office.
> Mr. Snyder did produce to me the Pimentel letter
> the Court was referring to.  I did review it with my
> client at the time with the Spanish interpreter.  He
> did not recall that.  Some of his confusion here is
> whether or not this was a plea agreement as
> opposed to a Pimentel letter.

> THE COURT:  It's not.
>
> Mr. Garcia, I didn't mean to suggest that this letter
> was binding on you.  I'm simply asking if you got a
> letter stating what the government's position was
> with respect to the guideline range.  That letter is
> not binding on you at all.
>
> Do you understand that?

> THE DEFENDANT:  Yes.

> THE COURT:  It's not binding on me either.  You understand that?

> THE DEFENDANT:  Yes.

THE COURT:   I have my own obligation to determine what the correct guideline range is and to consult that range in determining a sentence in this case.

Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:   However, I should also tell you that in the event that I decide to sentence you to the range that the government said it was, or even higher, I'm not going to let you withdraw your plea simply because you don't like the guideline range.

Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:   In fact, regardless of the guideline range, I can impose any sentence that I think is reasonable up to life imprisonment on Count 1.

Do you understand that?

THE DEFENDANT:  Yes, sir.

(*Id.*, at SA-15 to SA-16.)

At the close of the plea allocution, Petitioner described, in his own words, the conduct that he believed made him guilty of the charged crime.  Specifically, Petitioner admitted his guilt as follows:

> I admit that in January and February of the year 2003, here in New York City, I helped, along with another person[,] with the deal of selling – group of selling drugs, and in the years 2002 and 2003, this group sold more than five kilograms of cocaine and one kilogram of heroin to sell these drugs.  I spoke by telephone and made arrangements to pick up and deliver the proceeds of the sale. I knew that upon receiving this money and then delivering it to the group that this money came as a result of my sale.  I knew that what I was doing was illegal.  My participation in this conspiracy was to pick up money and deliver it to a person.

7

(*Id.*, at SA-18.)  After posing some additional questions to Petitioner to clarify that Petitioner had understood, at the time of his conduct, that his described participation in the distribution of money "was part of the scheme to distribute drugs in return for money" (*id.*, at SA-19), the Court concluded that there was a sufficient basis for the plea (*see id.*, at SA-7 to SA-20).  Finding Petitioner's plea to be knowing and voluntary, the Court accepted the plea and entered a judgment of "guilty" against Petitioner.  (*Id.*, at SA-19 to SA-20.)

        **D.**      **The Presentence Report**

       The Presentence Report ("PSR") prepared by the Probation Office stated that Petitioner's base offense level was 36, based on the quantity of drugs involved in the offense.  (PSR ¶ 33.)  The PSR noted that, in the Government's *Pimentel* letter, the Government had indicated that an upward adjustment was warranted because of Petitioner's level of involvement in the charged criminal activity.  (*Id.* ¶ 36.)  The Probation Office, however, also noted that it had not been given information to support such an upward adjustment, and thus did not recommend it.  (*Id.* ¶ 36.)[5]  Instead, the PSR recommended a two-level reduction, pursuant to U.S.S.G. § 2D1.1(b)(9), because Petitioner appeared to meet the "safety valve" criteria set out in U.S.S.G. § 5C1.2(a) (subdivisions 1-5).  (*Id.* ¶ 34.)  Combining this reduction with a three-level reduction for acceptance of responsibility, based on Petitioner's plea (*id.* ¶ 39), the PSR calculated Petitioner's Guidelines offense level to be 31 (*id.* ¶ 42).  In light of Petitioner's Criminal History Category of I (*id.* ¶ 45), the PSR concluded that his Guidelines sentencing range was from 108 to 135 months imprisonment (*id.* ¶ 76).

---

    [5] The PSR noted that the Government had described one of Petitioner's co-defendants, Luis Maunel Reinoso ("Reinoso") "as a leader or manager of the organization, . . . who was responsible for distributing more than 150 kilograms of cocaine."  (*Id.* ¶ 28.)

### E.   *Fatico* Hearing and Sentencing

Prior to Petitioner's sentencing, this case was reassigned to the Honorable Jed S. Rakoff, U.S.D.J.  (*See* Dkt. 119, in 03 Cr. 134.)  Sentencing before Judge Rakoff did not occur immediately, however, as the Government objected to the Guidelines calculation contained in the PSR, and thus the Court scheduled a pre-sentence *Fatico* hearing to resolve the factual issues underlying the Government's objection.[6]  In advance of that hearing, Petitioner, through newly-appointed counsel, Paul J. McAllister, Esq. ("McAllister"),[7] made a written submission to the Court, setting out Petitioner's position on a number of issues that would potentially be in contention at the hearing.  (*See* Supp. App'x, at SA-25 to SA-30 (Letter to the Court from McAllister, dated July 30, 2007).)  The Government, for its part, apparently made no written submission.  The Court commenced the *Fatico* hearing on August 7, 2007, and continued it on August 14 and 16, 2007.  (*Id.*, at SA-31 to SA-160 (Transcript of Aug. 7, 2007 hearing); SA-161 to SA-185 (Transcript of Aug. 14, 2007 hearing); SA-186 to SA-264 (Transcript of Aug. 16, 2007 hearing and sentencing) (all, collectively, "*Fatico*/Sentencing Tr.").)

At the outset of the hearing, the Court clarified the issues that were before it.  The Government stated its objections to the PSR, arguing specifically that, contrary to what was set forth in the PSR, (1) Petitioner was not eligible for safety-valve relief, and (2) (as the

---

[6] Under *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), a court may hold an evidentiary hearing following a plea or conviction at trial and prior to sentencing, in order to resolve factual disputes that may bear on determining the sentence to be imposed.  *See, e.g.*, *United States v. Salim*, 690 F.3d 115, 120 (2d Cir. 2012); *United States v. Hernandez*, No. 99 Cr. 73 (JFK), 2004 U.S. Dist. LEXIS 7709, at *1 (S.D.N.Y. May 3, 2004).

[7] As noted above, Petitioner was represented by Joyce during the plea proceedings, but, by Order dated April 5, 2007, the Court approved a substitution of counsel.  (*See* Dkt. 126, in 03 Cr. 134.)

Government had indicated in its *Pimentel* letter) a three-level increase in the offense level was warranted because of the "manager" or "supervisor" role allegedly played by Petitioner in the charged conspiracy.  (*Fatico*/Sentencing Tr., at SA-34.)  The Court noted that the Government would bear the burden of proof on each of these issues, which would then warrant consideration by the Court, together with the more general sentencing factors set out in 18 U.S.C. § 3553(a).  (*Id.*, at SA-35.)

During the hearing, the Government presented the testimony of two cooperating witnesses, Edwin Sanchez ("Sanchez") (*id.*, at SA-36 to SA-96) and Arlei Mauricio Restrepo-Macias ("Restrepo") (*id.*, at SA-109 to SA-119).  Both of these witnesses testified to facts suggesting that Petitioner was, as the Court later described it, "prominently involved" in drug transactions.  (*Id.*, at SA-255; *see also, generally, id.*, at SA-36 to SA-63 (Sanchez direct testimony); SA-109 to SA-114 (Restrepo direct testimony).)  Sanchez gave detailed testimony regarding Petitioner's substantial role in obtaining heroin from suppliers (*see, e.g., id.*, at SA-52 to SA-56); in pressing heroin into tablets (*see, e.g., id.*, at SA-46 to SA-48; SA-51); in directing and paying for the drug-related activities of others, including Sanchez (*see, e.g., id.*, at SA-42 to SA-43; SA-47; SA-50 to SA-51; SA-56 to SA-58); in negotiating the price for heroin sales (*see, e.g., id.*, at SA-56 to SA-57); and in distributing heroin, at times in kilogram quantities, to individuals whom Sanchez described as Petitioner's customers (*see, e.g., id.*, at SA-45 to SA-46, SA-51, SA-57).  Restrepo, for his part, testified to observing Petitioner obtain one kilogram of heroin from a supplier known as "El Flaco,"[8] and also testified to Petitioner's involvement, with

_____

[8] Sanchez also testified about the involvement of an individual he referred to as "Flaco," which was apparently an alias used by one of Petitioner's co-defendants, Luis Guillermo Salazar-Diez.  (*See id.*, at SA-44 (Sanchez testimony identifying "Flaco" as "Mr. Salazar"); *see also* Indictment (naming Salazar-Diez as "a/k/a 'El Flaco'").)  At one point, the transcript of the

others, in receiving 40 kilograms of cocaine and in determining whether both the cocaine and heroin were of sufficient quality for distribution.  (*See id.*, at SA-112 to SA-114.)

In cross-examining Sanchez, Petitioner's counsel, McAllister, asked certain questions that were based on information contained in affidavits that Petitioner had obtained from two witnesses, Hernando Padilla ("Padilla") and Alex Klepach ("Klepach"), and provided to McAllister.  (*See id.*, at SA-69 to SA-73; SA-96 to SA-98.)  Padilla's affidavit stated that Sanchez had asked him to tell Petitioner that the Government was "putting pressure" on Sanchez to testify against Petitioner at the *Fatico* hearing, by threatening to arrest Sanchez's wife if he did not do "what they ask[ed] [him] to do."  (Supp. App'x, at SA-23 (Affidavit of Hernando Padilla, made under penalty of perjury, and dated July 3, 2007).)  Klepach's affidavit stated that, during a period when both Klepach and Sanchez were in custody at the Metropolitan Detention Center, Kepach purchased marijuana and cigarettes from Sanchez.  (*Id.*, at SA-24 (Affidavit of Alex Klepach, made under penalty of perjury, and dated July 10, 2007).)  The Court directed both of these witnesses to appear at the hearing (*see Fatico*/Sentencing Tr., at SA-103 to SA-105), and each did, but each invoked his Fifth Amendment right against self-incrimination and declined to testify regarding the substance of his affidavit (*see id.*, at SA-166 to SA-167; SA-169 to SA-170).

---

*Fatico* hearing indicates that Restrepo identified "Flaco" as Petitioner (*see Fatico*/Sentencing Tr., at SA-113 (The Court: "When you refer to Flaco, who are you referring to?"  The Witness: "Mr. Leonardo Garcia.")), but, from the full context of Restrepo's testimony, it seems clear that this is a transcription error, and that the Court was actually asking for an identification of the person referred to by Restrepo as "Flechas" (*see generally id.*, at SA-109 to SA-114; *see also id.*, at SA-209 (Government noting, in summation, that Restrepo "called [Petitioner] Flech[a]s – the other name for [Petitioner]")).

Petitioner testified on his own behalf at the hearing (*id*, at SA-120 to SA-157), denying that he had any major role in the drug conspiracy (*see generally id*.), and also presented testimony from another witness, Reinoso (*see id.*, at SA-188 to SA-205; *see also* n.5, *supra*), who supported Petitioner's testimony that Petitioner was not involved with the 40-kilogram cocaine transaction to which Restrepo had testified (*see id.*, at SA-190).

At the conclusion of the hearing, and after reviewing certain documentary evidence offered by the Government – including prior statements of both Sanchez and Restrepo that were produced by the Government pursuant to 18 U.S.C. § 3500, and various records tending to suggest that Petitioner had solicited false affidavits from both Padilla and Klepach – and hearing closing arguments, the Court made findings that were adverse to Petitioner.

The Court noted that the Government's witnesses, Sanchez and Restrepo, were both cooperating with the Government, and stated that the Court had therefore scrutinized these witnesses' testimony "with great care and caution." (*Id.*, at SA-255.) Nonetheless, the Court found that these were both "credible and accurate witnesses" (*id.*, at SA-253), whose testimony was largely supported by the Section 3500 material (*id.*, at SA-253 to SA-255), who "corroborated each other in important respects" (*id.*, at SA-255), whose demeanor suggested that they were giving "straightforward" answers to the questions put to them (*id.*, at SA-256), and whose testimony "ma[de] sense" (*id.*).

On the other hand, the Court found that Petitioner's testimony was not credible, particularly his denials that certain recorded telephone conversations had related to drugs. (*See id.*, at SA-256 to SA-257.) In fact, the Court found that Petitioner had "lied so brazenly and so often" that his testimony alone would have warranted a Guidelines enhancement for obstruction of justice. (*Id.*, at SA-257.) Beyond that, the Court also found that Petitioner had

12

> orchestrated . . . an attempt to obstruct [the Court] from reaching a
> fair determination of this matter by soliciting false affidavits, by
> purchasing a false affidavit from Mr. Klepach, by getting
> Mr. Padilla to sign an affidavit that was in English where it was
> self-evident, even in the taking of the Fifth by Mr. Padilla, that he
> had little or no comprehension of the English language [and] [b]y
> inviting Mr. Reinoso to testify.

(*Id.*)[9]  Overall, the Court found Petitioner's conduct to constitute "one of the most brazen

attempts at obstruction" that the Court had seen in "11 years on the bench."  (*Id.*)

As a result of its findings, the Court determined that Petitioner's base offense level

was 36; that a three-level increase for Petitioner's "managerial role" in the offense was

warranted; and that an additional increase of two points was appropriate for Petitioner's

obstruction of justice (with no reduction for acceptance of responsibility), leading to an

applicable Guidelines offense level of 41.  (*See id.*, at SA-259.)  This, with a Criminal History

Category of I, yielded an adjusted Guidelines sentencing range of 324 to 405 months

imprisonment.  (*Id.*)  Nonetheless, the Court determined that this computation "overstate[d] the

situation to some degree" (*id.*), and, taking into account a family situation that had been raised

by Petitioner's counsel[10] and the factors set out in 18 U.S.C. § 3553(a), the Court imposed a

---

[9] The Court also did not credit Reinoso's testimony, characterizing portions of it
(specifically regarding the nature of Reinoso's conversations with Petitioner, prior to Reinoso's
testimony) as "utterly preposterous" (*id.*, at SA-258), and the core substance of the testimony
(regarding Petitioner's supposed lack of involvement in the 40-kilogram cocaine transaction) to
be "false" (*see id.*, at SA-258 to SA-259).

[10] In his closing argument, McAllister asked the Court for leniency, in light of
Petitioner's statements that he had become involved in the drug conspiracy "because his
daughter was desperately ill and in need of a liver transplant."  (*Id.*, at SA-249.)

sentence of 240 months imprisonment, to be followed by five years of supervised release – a

sentence below the non-binding, adjusted Guidelines range.  (*Id.*, at SA-260, SA-262.)[11]

     **F.**     **<u>Petitioner's Appeal</u>**

     Petitioner appealed his sentence to the Second Circuit (*see* Brief and Appendix for

Defendant-Appellant Geraldo Garcia, Docket No. 07-3779-cr(L), filed Apr. 22, 2008), arguing

that his sentence was unreasonable and that he had received ineffective assistance of counsel in

connection with his sentencing.  In particular, Petitioner argued that his counsel was ineffective

for supposedly (1) insisting, over Petitioner's wishes, that he request a *Fatico* hearing to

challenge the Guidelines calculation in the PSR, (2) failing to be present for Petitioner's

interview by the Probation Department for the purpose of preparing the PSR, (3) falsely

promising Petitioner that a *Fatico* hearing would result in a sentence lower than that set out in

the PSR, and (4) advising Petitioner to testify at the *Fatico* hearing, but then failing to prepare

him for that testimony.  (*See generally id*.)

     In a Summary Order dated August 11, 2009, the Second Circuit affirmed the judgment of

conviction in all respects.  *Garcia v. United States*, 340 Fed. App'x 721 (2d Cir. 2009).  With

respect to Petitioner's challenge to the reasonableness of his sentence (a claim reviewed for

abuse of discretion), the court held:

> We cannot conclude that the district court abused its
> discretion here.  The district judge explored and fully considered
> [Petitioner's] submissions during the course of the *Fatico* hearing;
> he also considered the § 3553(a) factors.  After this exhaustive
> review, he imposed a sentence that was lower than the adjusted
> Guidelines range (*i.e.*, a range that was adjusted based on his
> factual findings with respect to the offense level calculation as a

---

[11] The Court imposed no fine, finding that Petitioner was "not in a position to pay any
meaningful fine," but imposed the mandatory special assessment of $100.  (*Id*., at SA-260.)

> result of the *Fatico* hearing). And, he observed before imposing
> sentence that 'I do take account, for what it's worth, of the point
> made . . . regarding the family situation and that it may have been
> part of the motivation for what [Petitioner] did.' There was no
> abuse of discretion.

*Id.*, at 722.

As to Petitioner's ineffective-assistance-of-counsel claims, the court first found that, despite Petitioner's complaint that his counsel had failed to attend a particular meeting with the Probation Office, the PSR itself reflected that Probation did not question Petitioner about the crime during that meeting, and an addendum to the PSR showed that Probation had further contact with Petitioner and his counsel thereafter. In short, the court found no merit to Petitioner's claim that his counsel had not been involved in the PSR preparation process, and, to the extent counsel had not attended a specific meeting, the court concluded that Petitioner could not show the requisite prejudice. *See id.*, at 723.

The court also flatly rejected Petitioner's assertion that his counsel had insisted on requesting a *Fatico* hearing. As to this claim, the court found, based on the record, that the *Fatico* hearing was *not* requested by Petitioner's counsel, but rather "was prompted by the government's objections to the PSR's conclusions, including an objection as to [Petitioner's] eligibility for safety valve relief." *Id.*

Finally, with respect to Petitioner's ineffective-assistance claims based on his counsel's supposed promise that the *Fatico* hearing would result in a reduced sentence and counsel's alleged failure to prepare Petitioner to testify at the hearing, the court found that there was "simply nothing in the record to support the allegations." *Id.* "Instead," the court stated, "the transcript indicates that the 'increased' sentence was the result of [Petitioner's] own perjury and other misconduct." *Id.*

15

### G.   Petitioner's Motion Under 28 U.S.C. § 2255

On August 2, 2010, Petitioner filed a motion in this Court, seeking to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  (*See* Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, dated Aug. 2, 2010 ("Petition") (Dkt. 1, in 10 Civ. 6653).)[12]  After the Government filed an opposition (*see* Memorandum of Law of the United States of America in Opposition to the Motion of Geraldo Garcia Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct His Sentence, dated Feb. 14, 2011 ("Resp. Mem.") (Dkt. 7, in 10 Civ. 6653; Dkt. 187, in 03 Cr. 134)), Petitioner filed a reply (*see* Pet. Reply).  Affording his papers a liberal construction,[13] this Court understands Petitioner's claims mostly to cluster around two central arguments.

First, Petitioner maintains that Joyce, his attorney at the plea stage, told Petitioner that he (as counsel) had entered into an oral agreement with the prosecutor for Petitioner to plead guilty in exchange for a reduced sentence – which Petitioner's papers variously place at either 70 months imprisonment (*see* Petition ¶ 12(F); Pet. Reply, at 20-21), or 87 months imprisonment (*see* Pet. Reply, at 3, 4-5, 7) – and that Petitioner was "coerced" to plead guilty by his counsel's representation to him that the Government had agreed to such a sentence (*see* Petition ¶ 12(A);

---

[12] Although the Court's Docket reflects a filing date of September 8, 2010, for Petitioner's motion, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack*, 487 U.S. 266, 270 (1988), and this Court will therefore deem the motion to have been filed on August 2, 2010, the date when Petitioner apparently signed it, *see, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

[13] Where a petitioner appears *pro se*, the Court must "read the pleadings . . . liberally and interpret them to raise the strongest arguments that they suggest."  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks omitted).  In addition, the papers submitted by a *pro se* litigant in connection with a motion may be read to supplement or amplify his pleaded allegations.  *See, e.g.*, *Johnson v. Wright*, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002).

Pet. Reply, at 7).  Although Petitioner recognizes that, during the plea allocution, he was asked whether he had entered into any plea agreement, and that he answered "no," he now seems to take the position that this was a truthful response because he, *personally*, did not enter into any agreement (nor could he have negotiated directly with the prosecutor), but that his *attorney* did. (*See* Pet. Reply, at 5-6, 7-8.)  Petitioner appears to claim that he received ineffective assistance of counsel both when Joyce allegedly induced him to plead guilty by telling him of the supposed agreement (Petition ¶ 12(A); Pet. Reply, at 4-5, 7-8), and again when Joyce allegedly failed to inform the Court, during the plea proceedings, of the plea deal purportedly reached between counsel (Pet. Reply, at 6).  In related arguments,  Petitioner appears to contend that his later attorney, McAllister, was also ineffective for failing to inform the Court of the supposed plea deal (Petition ¶ 12(F); Pet. Reply, at 20-22), and that the prosecutor engaged in misconduct by failing to stand by the purported oral plea agreement and by instead pressing for a higher sentence (*see* Petition ¶ 12(G); Pet. Reply, at 23-24).

Second, Petitioner raises certain claims that appear to be based on an understanding that, after he pleaded guilty (thereby giving up his right to a trial by jury), he was supposed to go straight to sentencing, as, he says, was indicated by Judge Mukasey during the plea proceedings. Seemingly confusing the subsequent *Fatico* hearing for a trial, Petitioner asserts that, after Judge Mukasey *accepted* his guilty plea and waiver of a jury trial, Judge Rakoff proceeded to *reject* the plea (*see* Pet. Reply, at 3, 18), and then subjected Petitioner to a trial without a jury, finding him "guilty" as a result of that "bench trial" (*see id.*; *see also id.*, at 4, 6-7).  Petitioner contends that, as soon as he learned that the Government was going to present testimony against him in a non-jury proceeding, he instructed his counsel at the time, McAllister, to withdraw his guilty plea, and to make known his request for a jury trial.  (*See id.*, at 6-7, 18.)  He claims that

17

McAllister was ineffective for failing to inform the Court of this request (Petition ¶ 12(D)) and for "allow[ing]" the supposed bench trial to go forward (*id.* ¶ 12(E)).  Petitioner also seems to claim that the prosecutor engaged in misconduct by presenting the testimony of Government witnesses, which Petitioner claims was contrary to Judge Mukasey's "Order" that there should be no such testimony.  (*See id.* ¶ 12(G).)

        In addition to these main arguments, Petitioner also purports to challenge McAllister's effectiveness on the basis that he "lied" to the Court on the subject of whether Petitioner had any objections to the PSR.  (Petition ¶ 12(C); Pet. Reply, at 13-15.)

        Lastly, Petitioner claims that the Court lacked jurisdiction to enter the sentence that it did, arguing that his 240-month sentence was above a permitted maximum.  (*Id.* ¶ 12(B); Pet. Reply, at 10-11.)  Although the basis of this last claim is particularly difficult to discern, as Petitioner seems to rely on an unidentified Sentencing Commission "Policy Statement" (see Petition ¶ 12(B); Pet. Reply, at 10), his papers suggest that he may be trying to claim that the Court exceeded its authority by sentencing him, based on the testimony of witnesses, to a higher sentence than would have been permissible based solely on the facts elicited during his plea allocution (*see* Pet. Reply, at 10-12).

        The Government takes the position that Petitioner's ineffective-assistance-of-counsel claims are all without merit, and that his remaining claims, directed to the conduct of either the prosecutor or the Court, are procedurally barred and, in any event, without merit.  (*See generally* Resp. Mem.)

## DISCUSSION

### I.      APPLICABLE LEGAL STANDARDS

Under 28 U.S.C. § 2255, a convicted person held in federal custody may petition the sentencing court to vacate, set aside or correct his sentence.  A properly filed motion under Section 2255 must allege that:  (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.  *See* 28 U.S.C. § 2255.  Accordingly, collateral relief under Section 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).  A Section 2255 petition cannot be used to relitigate questions that were raised and considered on direct appeal, *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001), and also cannot be used to litigate questions that could have been raised on appeal, but were not, *see, e.g.*, *Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." (internal quotation marks and citation omitted));*United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997) ("A defendant is . . . barred from raising claims in his 2255 motion that he failed to raise on direct appeal unless he shows cause for the omission and prejudice resulting therefrom.").

## II.      PETITIONER'S CLAIMS

### A.      Claims Relating to Alleged Oral Plea Agreement

#### 1.      Ineffective Assistance of Plea Counsel: Alleged Coercion To Plead Guilty (Ground One)

Petitioner first claims that Joyce, the attorney who represented him in connection with his plea, was constitutionally ineffective because Joyce "coerced" Petitioner into pleading guilty by leading him to believe that he was getting a plea "deal" from the prosecution.  (Petition ¶ 12(A).)[14]  At some points in his papers, Petitioner appears to assert that this supposed plea deal was for a term of imprisonment of 70 months, while, at other points, he appears to assert that it was a deal for 87 months.  (*See* Background, *supra*, at Section G.)  Setting aside the credibility issues raised by Petitioner's own inconsistent statements about his understanding of the supposed deal, Petitioner's claim simply cannot stand in the face of the contrary statements he made during the plea proceedings.

In the course of the plea allocution, Petitioner confirmed, under oath, that no one had forced him, in any way, to plead guilty (Plea Tr., at SA-14); that he had no agreement with the Government relating to his plea (*id*.); that no one, "at all," had "made any kind of promise or inducement to [him] in order to get [him] to plead guilty" (*id*.); and that no one had made him any promises as to what his sentence would be (*id*; *see also id.*, at SA-17).  Given these statements on the record, Petitioner cannot now be heard to state otherwise.  *See United States v.*

---

[14] Petitioner did not raise this, or any of his other currently asserted, ineffective-assistance claims, on his appeal to the Second Circuit, but, given that these claims are not record-based, this does not bar this Court's consideration of the claims here.  *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 509 (2003) ("[F]ailure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255.").

*Hernandez*, 242 F.3d 110, 114 (2d Cir. 2001) (rejecting an ineffective assistance claim "on the merits because [the defendant's] factual assertions regarding his counsel's alleged ineffectiveness simply contradict his sworn statements at the plea allocution"); *see also Savinon v. Sears*, No. 09 Civ. 2529 (JPO) (DF), 2011 WL 6979974, at *9 (S.D.N.Y. Dec. 8, 2011) (recommending denial of habeas claim, where "[p]etitioner's allegation that he was unduly pressured to plead guilty [was] inconsistent with his own statements during the plea allocution), *report and recommendation adopted by* 2012 WL 77848 (S.D.N.Y. Jan. 10, 2012).

Petitioner's creative argument that the supposed oral plea agreement was not made by *him*, but rather by his *counsel,* and that his statements during the plea proceedings should therefore be read narrowly, is barely worthy of comment.  Even if this could explain away Petitioner's statement that *he* had no plea agreement with the Government (*id.*, at SA-14), which it cannot, it would do nothing to address Petitioner's further statement that no one had made him any promises, of any kind, to induce him to plead guilty (*id.*).  In short, the thorough plea allocution conducted in this case leaves no room for Petitioner now to assert that he was induced by his counsel to plead guilty.  Accordingly, the factual basis for the first claim raised by Petitioner on his motion (Ground One) cannot be credited, and the claim should be denied.

### 2.     Ineffective Assistance of Sentencing Counsel:  Alleged Failure To Raise Plea Deal at Sentencing (Ground Six)

To the extent that Petitioner is also seeking to claim that his later counsel, McAllister, gave him ineffective assistance by failing to inform the Court, at the time of sentencing, of the supposed plea deal (*see* Petition ¶ 12(F)), Petitioner's claim cannot survive under *Strickland v. Washington*, 466 U.S. 668 (1984).

21

*Strickland* sets out a two-part inquiry for ineffective-assistance claims.  466 U.S. at 687.

First, a petitioner must show that his counsel's representation fell below "an objective standard

of reasonableness" under "prevailing professional norms."  *Id.*, at 687-88.  On this prong of the

*Strickland* analysis, the reviewing court "'must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance,' bearing in mind that

'there are countless ways to provide effective assistance in any given case' and that 'even the

best criminal defense attorneys would not defend a particular client in the same way.'"  *United*

*States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).

Second, a petitioner must "affirmatively prove prejudice," demonstrating that, "but for counsel's

unprofessional errors, the result of the proceeding might have been different."  *Strickland*, 466

U.S. at 693-94.  The Court may reject an ineffective-assistance-of-counsel claim for failure to

satisfy either prong of the *Strickland* standard, without reaching the other.  *Id.*, at 697 (stating

that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed").

In this case, Petitioner cannot satisfy either prong of the *Strickland* standard, as he cannot

show any likelihood that, had McAllister made any motion to the Court based on Petitioner's

supposed plea deal, that motion would have had any chance of success.   Indeed, there is little

chance that the Court would have credited Petitioner's assertion that the Government had

previously entered into a plea deal, or that, despite Petitioner's sworn statements to the contrary,

he had been induced to plead guilty by the promise of a reduced sentence.  *See United States v.*

*Gonzalez*, 647 F.3d 41, 56-57 (2d Cir. 2011) ("Given that '[s]olemn declarations in open court

carry a strong presumption of verity,' and given 'the strong societal interest in the finality of

guilty pleas,' a 'defendant's bald statements that simply contradict what he said at his plea

allocution are not sufficient grounds to withdraw [his] guilty plea.'" (internal quotation marks and citations omitted)).

As Respondent points out, "counsel is not 'ineffective for failing to make a motion that would have been futile.'"  (Resp. Mem., at 13 (quoting *United States v. Abad*, 514 F.3d 271, 276 (2d Cir.), *cert. denied*, 129 S. Ct. 187 (2008)); *see also U.S. v. Arena*, 180 F.3d 380, 396-97 (2d Cir. 1999) (noting that the "[f]ailure to make a meritless argument does not amount to ineffective assistance"), *abrogated on other grounds*, *Schindler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003).)   For this reason, I recommend that this claim by Petitioner (Ground Six) be denied, as well.

### 3.   Prosecutorial Misconduct:  Alleged Failure To Honor the Plea Agreement (Ground Seven[15])

Although this is not readily evident from Petitioner's motion, it appears from his reply submission that, as part of his prosecutorial misconduct claim (Petition ¶ 12(G)), Petitioner may be attempting to argue that the prosecutor engaged in misconduct by failing to honor the supposed plea agreement (*see* Pet. Reply, at 23-24 ("Mr. Snyder, the Assistant United States Attorney, kn[e]w that he was not going to stand by his word with Mr. Joyce, counsel for Petitioner . . . .")).  Once again, however, Petitioner cannot rest a claim on assertions of fact that are contradictory to the statements that he made, under oath, during his plea allocution.  In light of those statements, there is no basis for this Court to find that there *was* any plea agreement in

---

[15] The Section 2255 form used by Petitioner to prepare his motion only has space for four grounds for relief, but Petitioner inserted an extra page in his motion, so as to raise additional grounds.  (*See* Petition, at p. 6.)  In so doing, Petitioner apparently neglected to correct the numbering on the pre-printed form, such that his seventh ground for relief is still identified as "Ground four."  (*See id*. ¶ 12(G).)  The Court will refer to that ground herein as "Ground Seven."

the first place, and thus there is no basis for the Court to conclude that the prosecutor failed to

honor any commitment it may have made under such an agreement.

Indeed, the prosecution, in this case, provided Petitioner with a *Pimentel* letter, which

expressly stated that it was *not* a plea agreement, that the sentence to be imposed on Petitioner

would be determined solely by the sentencing Court, and that the Government was making no

promise or representation as to the sentence that Petitioner would receive.  (Supp. App'x, at

SA-1, SA-3.)  The Court went over the *Pimentel* letter with Petitioner at the time of his plea, and

Plaintiff confirmed his understanding of it.  Under the circumstances, any claim that the

Government was bound by any plea agreement is without any merit, and should be denied.[16]

### B.   Claims Relating to the Non-Jury *Fatico* Hearing

#### 1.   Ineffective Assistance of Counsel:  Failure To Assist Petitioner in Securing a Jury Trial (Grounds Four and Five)

Petitioner asserts two ineffective-assistance-of-counsel claims that center on his apparent

perception that he was unlawfully denied the right to a trial by jury; each of these claims

essentially accuses McAllister of failing to make Petitioner's request for a jury trial known to the

Court.  In one of these claims (Ground Four), Petitioner asserts that, when he heard that the

Government was planning to have witnesses testify against him, he requested that counsel

"withdraw his guilty plea based on the fact that Judge Mukasey had order[ed] that no witness

will be testif[ying] in this case."  (*Id.* ¶ 12(D).)  Similarly, in the other claim (Ground Five),

Petitioner asserts that he received ineffective assistance of counsel when his counsel "allow[ed]

---

[16] Respondent contends that all of Petitioner's claims, other than his ineffective-assistance-of-counsel claims, are procedurally barred because they should have been raised on direct appeal, but were not.  (*See* Resp. Mem., at 16-18.)  The Court, however, need not reach the question of procedural bar, as, in any event, none of Petitioner's claims have any merit.

the Government to conduct trial without Jury," in disregard of Petitioner's request to withdraw his guilty plea, and in alleged contravention of his constitutional right to a trial by jury. (*Id.* ¶ 12(E).)

Both of these claims, which stem from Petitioner's expressed belief that the *Fatico* hearing was the equivalent of a "bench trial" on the criminal charge against him, are apparently based on a fundamental misunderstanding of the purpose of a *Fatico* hearing. The record does not reflect, as Petitioner contends (Pet. Reply, at 4, 6-7, 18), that Judge Rakoff declined to accept Petitioner's guilty plea. Rather, the record shows that the Court accepted Petitioner's plea, but then held an evidentiary hearing to resolve disputed factual issues that would be relevant to sentencing. (*See* n.6, *supra*.)

Following the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Booker*, 543 U.S. 220 (2005), and subsequent precedent examining the respective roles of courts and juries in finding facts material to sentencing, it was appropriate for the Court to have conducted the *Fatico* hearing without a jury. *See, e.g.*, *United States v. Cuevas*, 496 F.3d 256, 264-65 (2d Cir. 2007) ("[U]nder the post-*Booker* regime, the sentencing judge is entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."); *see also id.* (stating that, "[b]ecause the sentence imposed did not exceed the[] statutory maximums [for the offenses to which the defendant had pleaded guilty], the District Court did not violate [the defendant's] Sixth Amendment rights [to a jury trial] by relying on its own factual findings [following a *Fatico* hearing] in determining the appropriate Guidelines range"); *Valencia-Lopez v. United States*, No. 10–CV–02893 (NGG), 2012 WL 2160967, at *5-7 (E.D.N.Y. June 13, 2012) ("After *Booker*, facts that increase the Guidelines range alone, without

increasing the *statutory* maximum, do not violate the rule in *Apprendi*" that, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (internal quotation marks and citation omitted) (emphasis in original)).  Thus, the fact that the Court held such a hearing without a jury did not give Petitioner the right to withdraw his plea.

As any objection to the *Fatico* hearing on the ground that it deprived Petitioner of a jury trial would have been meritless, and as the presentation of witness testimony at the hearing did not give Petitioner the right to withdraw his plea (the validity of which he has never challenged[17]), any arguments that his counsel could have raised in that regard would have been futile.  For this reason, Petitioner cannot now prevail, under *Strickland*, on his ineffective-assistance-of-counsel claims that are directed to his counsel's alleged failure to inform the Court, at the time of the *Fatico* hearing, that Petitioner wanted to withdraw his plea and proceed with a jury trial.  Accordingly, these claims (Grounds Four and Five) should be denied.[18]

---

[17] Other than his claim (discussed *supra*) that he was "coerced" by his counsel to enter a guilty plea, Petitioner makes no argument on this motion that his plea was not knowing and voluntary.  He certainly does not argue that the information that he was provided by Judge Mukasey in the plea allocution was insufficient to enable him to make an intelligent decision as to whether to plead guilty.  Nor did Petitioner raise any such challenge to his plea on his direct appeal, even though, had there been any deficiency in the plea allocution, such a deficiency presumably could have been determined from the record of the plea proceedings.

[18] It should also be noted that, overall, the record reveals that McAllister represented Petitioner zealously and well in connection with the *Fatico* hearing and sentencing.  As noted above (*see* Background, *supra*, at Section E), McAllister submitted a pre-hearing statement to the Court, and he also vigorously cross-examined the Government's witnesses and made thoughtful and extensive arguments in favor of a lenient sentence, including at least one argument on which the Court explicitly relied in choosing to sentence Petitioner below the adjusted Guideline range (*see id.*; *see also, generally, Fatico*/Sentencing Tr.).  Indeed, the Court complimented McAllister for his efforts on Petitioner's behalf.  (*See* Fatico/Sentencing Tr., at SA-253 (noting that the Court was "grateful to able counsel on both sides for their very helpful arguments"); SA-256 (noting that McAllister had "done a splendid job" of trying to rehabilitate

### 2.    Prosecutorial Misconduct:  Introduction
   of Witness Testimony (Ground Seven)

The core of Petitioner's prosecutorial misconduct claim (Ground Seven) seems to be his contention that the Government had been "ordered" by Judge Mukasey not to present witness testimony against Petitioner (in light of his plea), and that the prosecution violated this supposed "Order" by presenting witness testimony at the *Fatico* hearing.  (*See* Petition ¶ 12(G).) Petitioner seems particularly outraged by the fact that the Government put its "confidential informant" (presumably meaning Sanchez) on the stand to give testimony against him.  (*See id.*; *see also* Pet. Reply, at 24.)  As with the claims discussed above, however, Petitioner again misconstrues the law, and he also misreads the statements made by Judge Mukasey during the plea proceedings.

Judge Mukasey effectively advised Petitioner that, by pleading guilty, he would be giving up his right to have a jury determine the question of his guilt; rather, the Court would enter a judgment of guilty based on the plea alone.  (*See* Plea Tr., at SA-10.)  Although Judge Mukasey also told Petitioner that he would then be sentenced on the basis of his plea, the Court added that it would impose sentence after it considered the PSR and other information received from the Government and Petitioner's counsel.  (*Id.*)  Petitioner did not have a constitutional right to have a jury decide all issues relevant to his sentencing, and Judge Mukasey never advised him that he did.  Nor did the Court "order" the Government not to present testimony at a *Fatico* hearing.

---

Petitioner's credibility, albeit without success).  "Considering the totality of the circumstances, at the time, and assessing trial counsel's representation as a whole," *Cotto v. Lord*, No. 99 Civ. 4874 (JGK), 2001 WL 21246, at *17-18 (S.D.N.Y. Jan. 9, 2001), Petitioner would be hard-pressed to argue that McAllister's representation during the *Fatico* hearing and at sentencing was "objectively unreasonable," *id.*, such that Petitioner was denied the effective assistance of counsel.

At bottom, Petitioner cannot demonstrate that the prosecution engaged in any misconduct in the course of the proceedings against him, and his prosecutorial-misconduct claim (Ground Seven) should be denied in its entirety.

### C.   Claim Relating to Counsel's Supposed "Lie" to the Court (Ground Three)

Petitioner raises one additional ineffective assistance claim, based solely on an allegation that McAllister "lied" to the Court when he told the Court, at the outset of the *Fatico* hearing, that Petitioner had no objection to the PSR, but "when in fact Petitioner [had] told counsel that he want[ed] to withdraw his guilty plea and that the PS[R] [was] wrong."  (Petition ¶ 12(C).)

Petitioner points to the following exchange at the outset of the *Fatico* hearing, as giving rise to this claim:

> THE COURT:  Are there any objections to the presentence report?
>
> MR. McALLISTER:  Your Honor, after having reviewed it a couple of times, my client did raise an objection which upon review I think may not be founded with respect to the calculation of the base offense narcotic level.
>
> I looked again – let me back up.  It's characterized as 36.  He thought it was 34.  When I first spoke with him, I thought I agreed, but then I looked at the table, the conversion table, and I think, although obviously he does not concede by any means that he is responsible for that level, he did raise that issue with me.  I don't want to let it go –
>
> THE COURT:  I don't understand a word you just said.
>
> Let me put to you some simple questions that I hope I can get simple answers to.
>
> Is there an objection to the presentence report?  Yes or no?
>
> MR. McALLISTER:  No.

28

(*Fatico*/Sentencing Tr., at SA-32 to SA-33.)  Petitioner asserts that when counsel gave this answer of "No," he did so in disregard of "the fact that Petitioner and [c]ounsel went over all of the thing[s] in the P[S]R that they [were] going to [o]bject[] to."  (Pet. Reply, at 14.)

Nowhere, however, does Petitioner now explain what he actually believed was objectionable about the PSR.  He has shown no error in the report or any basis for legitimate objection.  In fact, the PSR Guidelines calculation was favorable to Petitioner, and, in his own reply papers, Petitioner now states that the PSR recommendation was "correct."  (*See* Pet. Reply, at 25.)  Plainly, Petitioner has not demonstrated that he had a well-grounded objection to the PSR, and, as noted above, an ineffective-assistance claim cannot rely on counsel's failure to raise a meritless objection.  *See Arena*, 180 F.3d at 396-97.

### D.    Claim Relating to Sentence Imposed

Petitioner asserts that the Court lacked jurisdiction to impose a sentence that, according to Petitioner, was "112 months above the excess maximum authorized by law."  (Petition ¶ 12(B).)  In support of this claim, Petitioner does not explain what "law" he is referring to, other than to state, in a rather confusing fashion, that his sentence was "112 months over the excess authorized maximum that the Sentencing Commission applicable Policy Statement authorized under the Sentencing Guidelines manual for special base offense level guidelines."  (*Id.*)

The maximum sentence authorized by law for the offense committed by Petitioner was life imprisonment, as Petitioner was told during the plea allocution.  (*See* Plea Tr., at SA-2, SA-16.)  Not only did the Court sentence Petitioner well below that statutory maximum, but it even sentenced Petitioner to a prison term that was well below the applicable Guidelines range, as determined by the Court after the *Fatico* hearing.  Moreover, to the extent Petitioner's sentence was more severe than was initially anticipated by either party, this was patently the

29

result of Petitioner's own conduct in relation to the *Fatico* hearing – conduct that "appalled and disgusted" the Court. (*Fatico*/Sentencing Tr., at SA-259.)

As there is simply no merit to any contention that the Court lacked authority to impose the sentence that it did, Petitioner's claim to this effect (Ground Two) should be denied.

## CONCLUSION

For the foregoing reasons, I recommend that Petitioner's motion for relief under 28 U.S.C. § 2255 be denied in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three additional days for service by mail).  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, United States Courthouse, 500 Pearl Street, Room 1340, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Rakoff. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054

(2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*,

838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
       September 16, 2013

                                        Respectfully submitted,


                                        DEBRA FREEMAN
                                        United States Magistrate Judge



Copies to:

Mr. Geraldo Garcia
52676-054
Rivers Correctional Institute
P.O. Box 630
Winton, NC 27986

Respondent's counsel (via ECF)

31